# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
### BILLINGS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>ROSAICELA PLASIDA CONCHAS,<br><br>Defendant. | CR 25-47-BLG-WWM<br><br><br>ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS |

Before the Court is a Motion to Suppress filed by Defendant Rosaicela Plasida Conchas ("Ms. Conchas"). (Doc. 29). Ms. Conchas is charged with possession with the intent to distribute heroin and fentanyl, in violation of 21 U.S.C. § 841(a), and aiding and abetting, in violation of 18 U.S.C. § 2. (Doc. 1). The charges arise from a traffic stop conducted on October 25, 2024, when Montana Highway Patrol Sergeant Barry Kilpela ("Sergeant Kilpela") pulled over a tan sedan driven by Ms. Conchas. (Doc. 29 at 2). Ms. Conchas moves to suppress all evidence obtained from the stop, arguing that (1) the stop was unlawfully prolonged and (2) Ms. Conchas's consent to search was not given voluntarily. (*Id.* at 13, 21). The Government opposes the Motion. (Doc. 36). The Court held an evidentiary hearing on January 9, 2026. (Doc. 42).

For the following reasons, the Court denies the Motion to Suppress.

## I.  Factual Background

On October 25, 2024, at approximately 2:27 p.m., Sergeant Kilpela[1] was parked on the shoulder of the west-bound lanes of Interstate 94 near Billings. (Doc. 29 at 2).  He observed a tan, Chevrolet sedan traveling east in what appeared to be the middle of the two-lane roadway.  (*Id.*).  Sergeant Kilpela crossed the median and caught up with the sedan before witnessing it cross the centerline a second time.  (*Id.*).  He initiated a traffic stop by activating his emergency lights, and the sedan pulled over.  (*Id.* at 3; Doc. 30 at 2:27:40–2:28:03)[2].

Sergeant Kilpela approached the passenger-side window and spoke with the driver, who was later identified as Ms. Conchas.  (Doc. 29 at 2; Doc. 30 at 2:28:17).  Sergeant Kilpela explained that the reason he pulled her over was because she was driving over the centerline, and he asked her whether she was getting tired.  (Doc. 30 at 2:28:21–2:28:32).  Ms. Conchas denied being tired, but she acknowledged that she "kind of bit the line."  (Doc. 29 at 2).  Sergeant Kilpela asked Ms. Conchas for her registration and proof of insurance; she responded that she rented the vehicle from Enterprise in Los Angeles, two days earlier, and that

---

[1] Sergeant Kilpela has 13 years of experience as a Montana Highway Patrol Trooper.  (Hearing Transcript, 5:22, Jan. 9, 2026).  In the course of his employment, he has obtained over 800 hours of K9 training and over 250 hours of highway interdiction training, founded his department's interdiction team, and taught criminal interdiction nationally.  (*Id.*, 9:23, 10:2, 13:11).  He also has on the ground, practical experience in observing human behavior in the course of making over 7,000 traffic stops.  (*Id.*, 14:15).

[2] Doc. 30 refers to Sergeant Kilpela's body-camera footage.  The Court notes that while the body-camera footage was not played at the evidentiary hearing on the suppression motion, it is an exhibit in the record. Citations to this exhibit include internal timestamps indicating the point at which the cited conduct occurs.

she lost the rental contract. (Doc. 30 at 2:28:37–2:29:22; Doc. 29 at 3; Doc. 36 at 3). Sergeant Kilpela informed Ms. Conchas that he could retrieve the rental contract information on his computer and asked her to retrieve her driver's license and accompany him to his patrol car. (Doc. 30 at 2:29:30–2:29:50). Sergeant Kilpela told her "As long as everything checks out, I'll give you a warning, but you gotta make sure to stay in one lane." (*Id.* at 2:29:34–2:29:39). While speaking with Ms. Conchas, Sergeant Kilpela looked at the interior of the rental car and observed multiple empty energy drinks, a purse, and a second small handbag in the cabin of the vehicle. (Doc. 35-1 at 3).

Sergeant Kilpela testified that he often asks drivers to come to his patrol car so that he can fill out the warning or citation on his computer, rather than make multiple trips back and forth. (Hearing Transcript, 23:19–24:8). He further testified that during every traffic stop, as a standard practice, he will check the vehicle's license plate, insurance, and registration. (*Id.* at 24:12–24:13). If it is a fleet vehicle, then he will additionally check the vehicle identification number ("VIN"). (*Id.* at 24:14, 31:22–31:24). Sergeant Kilpela explained that he does this because fleet vehicles often get paired with the wrong license plate. (*Id.* at 32:7–32:8). Thus, the VIN represents the true identity of the vehicle, rather than a potentially mismatched license plate. (*Id.* at 32:17–32:18). Lastly, he will check if the driver has any outstanding warrants, determine whether their license is valid,

and confirm that all of the information on the license is up to date. (*Id.* at 24:14–24:18).

Before getting to the patrol car, Sergeant Kilpela stood behind the rental car and asked that Ms. Conchas give him her driver's license. (Doc. 30 at 2:30:22). While she attempted to remove her driver's license from her wallet, he asked her what happened to the rental contract. (*Id.* at 2:30:24–2:30:28). She responded, "I honestly lost it. . . I don't know what happened to it." (*Id.* at 2:30:28–2:30:33). He asked her how much further she had to go, and she said that she was driving to Rockford, Illinois, where she lived. (*Id.* at 2:30:32–2:30:42). Sergeant Kilpela then asked where she said she was coming from; Ms. Conchas responded, "L.A." (*Id.* at 2:30:41–2:30:44). Sergeant Kilpela noticed that Ms. Conchas was unable to get her driver's license out of her wallet, and he began to assist her. (*Id.* at 2:30:48).

Noting that Billings is not on the route from Los Angeles to Illinois, Sergeant Kilpela asked why she was coming through Montana. (*Id.* at 2:30:53–2:31:00). Ms. Conchas responded, "Well, this is the route it took me." (*Id.* at 2:31:03–2:31:06). Sergeant Kilpela asked incredulously, "To go from L.A. to Rockford?" (*Id.* at 2:31:07). Ms. Conchas then clarified that she was actually coming from Sacramento, California, and asked whether Sacramento and Los Angeles were the same place. (*Id.* at 2:31:10–2:31:22; Doc 35-1 at 3). Because

Los Angeles and Sacramento are in different regions of California, and because
Billings is not on the route to Illinois from either location, Sergeant Kilpela
became suspicious that she was either lost or being deceptive about the nature of
her trip. (Doc. 35-1 at 3).

Meanwhile, Sergeant Kilpela was unable to get the Defendant's driver's
license out of her wallet, so he asked her to get in the passenger seat of his patrol
car while she continued to try to remove the license. (Doc. 30 at 2:31:27–2:31:33).
As they got in the patrol car, Sergeant Kilpela confirmed that Ms. Conchas rented
the vehicle from Enterprise in Los Angeles, rather than Sacramento, and began to
do a search for the electronic record of the rental contract on his computer. (*Id.* at
2:31:57–2:32:03). Sergeant Kilpela commented that she should be on Interstate 80
if she was traveling from Los Angeles to Chicago. (*Id.* at 2:32:21–2:32:34).
Ms. Conchas did not respond to this comment. (*Id.*). At this point, Ms. Conchas
was finally able to produce her driver's license to Sergeant Kilpela, which took
two minutes and twenty seconds from the point of his initial request. (*Id.* at
2:32:40). Ms. Conchas confirmed for Sergeant Kilpela that she picked up the
rental car on October 23, a mere two days earlier, and then drove with her cousin
from Los Angeles to Sacramento to attend a funeral. (*Id.* at 2:32:53–2:33:05).

While Sergeant Kilpela entered her license information into his computer, he
asked Ms. Conchas more about the funeral and her travels and she noted that the

funeral was the previous day. (*Id.* at 2:34:04–2:35:10; Hearing Transcript, 25:15–25:18). He asked why she did not fly home, and she responded that she thought it would be better to drive. (Doc. 30 at 2:35:31–2:35:40). Sergeant Kilpela asked whether she had a job that she had to get back to, and Ms. Conchas responded that she was not working at the moment. (*Id.* at 2:35:39–2:35:47).

Sergeant Kilpela asked Ms. Conchas to verify her address and middle name and whether she had any tickets or arrests. (*Id.* at 2:35:43–2:36:10). He then contacted dispatch and requested "Triple-I" and El Paso Intelligence Center ("EPIC") checks. (*Id.* at 2:36:20).

Sergeant Kilpela asked Ms. Conchas if she drove through the night. (*Id.* at 2:37:35–2:37:41).[3] She responded that she had stopped once for about two hours. (*Id.* at 2:37:58). Sergeant Kilpela continued typing on his computer and asked Ms. Conchas about the last time she worked. (*Id.* at 2:38:45). She answered, "about a month ago." (*Id.* at 2:38:48). He asked her how much it would have cost to fly home; she responded that the flight would have been $512, while the rental car was $437. (*Id.* at 2:39:36–2:39:48). Sergeant Kilpela asked if she planned to stop anywhere or knew anyone in the area. (*Id.* at 2:39:58–2:40:08). Ms. Conchas

---

[3] The government asserts that Ms. Conchas claimed to have begun her drive at midnight (Doc. 36 at 5), but the audio in the record is not clear on this point.

shook her head no. (*Id.* at 2:40:10). She claimed that her GPS routed her through Montana. (*Id.* at 2:40:18).

Sergeant Kilpela noted to himself that Ms. Conchas was not dressed in funeral clothing, and that when he first approached Ms. Conchas's vehicle, he only noticed a small bag in the cabin of the rental car. (Doc. 35-1 at 4). Sergeant Kilpela asked Ms. Conchas if she had luggage in the trunk. (*Id.* at 2:40:59– 2:41:06). Ms. Conchas denied that she did and noted that she had not accessed the trunk of the car. (*Id.* at 2:41:01–2:41:06).

During this conversation, Sergeant Kilpela could not locate Defendant's rental contract with Enterprise online. (Doc. 35-1 at 4). However, he was able to pull up an Enterprise contract under her name from April 2024 that indicated she rented a car in Beloit, Wisconsin, and returned it to Logan International Airport in Boston, Massachusetts.[4] (*Id.*). When Sergeant Kilpela asked her about this rental, she recalled renting it but could not remember where she went with the car. (Doc. 30 at 2:41:53–2:42:10). When he explained that she dropped it off in Boston, Ms. Conchas thought for a moment and said, "I've rented in Phoenix." (*Id.* at 2:42:10–2:42:23).

---

[4] The information obtained from Enterprise confirmed that Ms. Conchas rented the car for a total of 24 hours and drove 1,106 miles beginning at 9:46 a.m. on April 29th and concluding at 9:57 a.m. on April 30th. (Doc. 35-1 at 8-9). Ms. Conchas drove through the night on this occasion as well.

Sergeant Kilpela testified that in his experience rental cars are popular for drug smuggling because they are not tied to a certain individual, making them difficult to surveil or track. (Hearing Transcript, 30:19–31:5). Additionally, drug couriers do not run the risk of their vehicle being seized or forfeited because the vehicles do not belong to them. (*Id.* at 59:8–59:10). Consequently, when Sergeant Kilpela learned that Ms. Conchas had rented different vehicles in different cities across the country and returned them with high mileage for the rental period, he became suspicious that Ms. Conchas was involved in criminal activity. (*Id.* at 31:5–31:11).

Having been unable to find information for her current contract with Enterprise, Sergeant Kilpela got out of his patrol car and walked back to her rental vehicle to retrieve the VIN. (Doc. 30 at 2:42:45–2:43:22). When he came back to the patrol car, Ms. Conchas revealed that she had a text message from the rental car company which advised that she received the wrong vehicle. (*Id.* at 2:43:23–2:43:55). She offered to show him the message. (*Id.*).[5] Sergeant Kilpela did not respond to her offer but verified that he was giving her a warning for driving over the centerline, cautioned her not to drive while tired, and handed her the warning.

---

[5] Ms. Conchas contends that her seizure could have been briefer if Sergeant Kilpela would have accepted her offer to provide information received by e-mail from Enterprise. It is unclear whether the e-mail would have included the information that he needed, but the timing of her disclosure undermines the contention. The first time that she mentioned the existence of the e-mail coincided with the completion of the mission of the stop, so the length of the stop would not have been shorter had Sergeant Kilpela reviewed the e-mail.

(*Id.* at 2:43:55–2:44:39). In total, it took approximately 17 minutes from the time Sergeant Kilpela pulled Ms. Conchas over to issue her the traffic warning.

Sergeant Kilpela retained the Defendant's driver's license and explained to her that it was his job to make sure that nothing illegal crossed into Montana. (*Id.* at 2:44:39–2:44:59). He asked whether the car contained anything illegal, and Ms. Conchas said no. (*Id.* at 2:44:59–2:45:03). She confirmed that she was responsible for everything in the car. (*Id.* at 2:45:05). Sergeant Kilpela then asked if Ms. Conchas had any issue with him searching the car. (*Id.* at 2:45:09–2:45:13). She shook her head and said "nuh-uh," indicating that she did not. (*Id.*). At this point, Sergeant Kilpela handed Ms. Conchas her license back and printed a waiver titled "Montana Highway Patrol—Permission to Search and Seize." (Doc. 35-1 at 7).

Sergeant Kilpela showed Ms. Conchas the waiver and explained that her signature would confirm her authorization for him to search her vehicle and seize any contraband found. (Doc. 30 at 2:46:36–2:46:45). Ms. Conchas took the waiver, read it over for about 20 seconds, and signed it. (*Id.* at 2:46:45–2:47:19). The one-page waiver contained the following language:

> The undersigned, does hereby voluntarily authorize SGT BARRY
> KILPELA and other officers that may be designated to assist them, to
> search my person and any vehicle. . . I am giving this written
> permission to these officers freely and voluntarily, without any threats
> or promises having been made, and after having been informed by said

officer that I have a right to refuse this search and or seizure, and to
stop such search at any time.

(Doc. 35-1 at 7).[6]  Sergeant Kilpela told Ms. Conchas he was going to start

searching her vehicle "with her consent" and if she needed him to stop or had a

question for him, she could honk the horn.  (Doc. 30 at 2:47:34–2:47:48).  As

Sergeant Kilpela got out of the patrol car, dispatch informed him that Ms. Conchas

did not have a criminal history in their system, nor did she have any warrants in her

name.  (Hearing Transcript, 26:18–26:23).

Sergeant Kilpela's search uncovered 16 vacuum-sealed packages hidden

beneath the trunk's carpet lining.  (Doc. 35-1 at 5).  Believing the packages to be

narcotics, he returned to the patrol car and arrested Ms. Conchas.  (Doc. 30 at

3:01:58).  Sergeant Kilpela advised Ms. Conchas of her *Miranda* rights, and she

verbally indicated that she understood.  (*Id.* at 3:01:57–3:02:13).

Montana Highway Patrol Sergeant Josh French arrived at the scene of the

stop following the arrest of Ms. Conchas and assisted in the remainder of the

search, which ultimately yielded approximately six kilograms of heroin,

four kilograms of powdered fentanyl, and two cell phones.  (*Id.*; Doc. 36 at 6).

---

[6] Following issuance of the warning, it took 34 seconds for Sergeant Kilpela to request and receive her
verbal consent to search.  It took an additional 2 minutes and 6 seconds for Ms. Conchas to sign the
waiver.

## II.    Legal Standard

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, house, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV.  This protection extends to all forms of seizure, including brief detentions that fall short of a formal arrest, such as a traffic stop. *United States v. Brignoni-Ponce*, 422 U.S. 873, 878 (1975); *Whren v. United States,* 517 U.S. 806, 809-10 (1996).  The Supreme Court has repeatedly affirmed that "the ultimate touchstone of the Fourth Amendment is 'reasonableness.'" *Heien v. North Carolina*, 574 U.S. 54, 60 (2014).  The reasonableness of a seizure "depends on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers." *Brignoni-Ponce*, 422 U.S. at 878.

In order to effectuate the Fourth Amendment's protection, defendants have the right to have any evidence secured by means of an unlawful search and seizure excluded from trial, upon motion and proof. *Simmons v. United States*, 390 U.S. 377, 389 (1968) (citing *Weeks v. United States*, 232 U.S. 383, 398 (1914)); Fed. R. Crim. P. 12(b)(3)(C).  Characterized as "fruit of the poisonous tree," evidence seized as a result of an unlawful search or seizure is subject to exclusion unless it has been sufficiently "purged of the primary taint." *Wong Sun v. United States*, 371 U.S. 471, 485-88 (1963).  A defendant has the ultimate burden of proof on a

Fourth Amendment motion to suppress.  *United States v. Caymen*, 404 F.3d 1196, 1199 (9th Cir. 2005).

## III.    Discussion

At the outset, Ms. Conchas appears to concede—and the Court agrees—that the initial traffic stop was lawful.  (Doc. 29 at 15).  By stating that their interaction reached a point at which the mission of the stop was complete, Ms. Conchas does not appear to take issue with the legal viability of the stop.  (*Id.*).  Sergeant Kilpela's observations of Ms. Conchas driving in the middle of the roadway and crossing the centerline—a violation of Mont. Code Ann. § 61-8-328(1)—provided sufficient justification for a lawful traffic stop.  *See Whren*, 517 U.S. at 810 ("[T]he decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred.").

Given the legitimacy of the initial stop, the Court turns to the remaining issues:  whether the stop was unlawfully prolonged and whether the subsequent search was supported by voluntary and intelligent consent.[7]

---

[7] The parties stake out different positions on the question of whether the consent to search the vehicle by Ms. Conchas provides a basis to deny the motion to suppress.  The United States argues that the Court should deny the motion because an officer may request consent to search at any time after a lawful traffic stop has been initiated with or without reasonable suspicion even though the stop was prolonged while the consent to search was requested and obtained.  (Doc. 36 at 9; Hearing Transcript, 71:15–71:25).  However, Ms. Conchas asserts that the time it took for Sergeant Kilpela to request and receive her consent to search unlawfully prolonged the search after the mission of the stop had concluded.  The Defendant also suggests that the analysis of the legal viability of the search might be different if Sergeant Kilpela sought her consent to search earlier in their interaction.  (Doc. 29 at 21).  The Court does not reach these questions based upon its holding that Sergeant Kilpela's actions did not unlawfully prolong the seizure of the Defendant and that he had reasonable suspicion to suspect the occurrence of a separate offense by the time he sought and received her consent to search the vehicle.

A.    *Duration of the Stop*

A traffic stop "can only last as long as is reasonably necessary to carry out the 'mission' of the stop, unless police have an independent reason to detain the motorist longer." *United States v. Gorman*, 859 F.3d 706, 714 (9th Cir. 2017). The "mission" of a traffic stop includes determining whether to issue a traffic ticket and "ordinary inquiries incident to the stop." *Rodriguez v. United States*, 575 U.S. 348, 355 (2015); *see also United States v. Landeros*, 913 F.3d 862, 868 (9th Cir. 2019); *United States v. Evans*, 786 F.3d 779, 786 (9th Cir. 2015). These inquiries include "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Rodriguez*, 575 U.S. at 355. Police may order the driver to exit the vehicle, request identification, and ask questions about travel without exceeding the scope of a traffic stop. *Id.* at 356. In short, "[w]hen the police pull someone over for a traffic violation, the officer can obviously investigate that traffic infraction." *United States v. Ramirez*, 98 F.4th 1141, 1143–44 (9th Cir. 2024).

If a stop exceeds the time needed to "handle the matter for which the stop was made," then it violates the Fourth Amendment. *Rodriguez*, 575 U.S. at 350. "Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Id.* at 354. There is no "de minimis"

exception; any time added to a traffic stop that is unrelated to the mission is unlawful. *Landeros*, 913 F.3d at 867. Even so, police "may conduct certain unrelated checks" during a traffic stop, but they "may not do so in a way that prolongs the stop absent reasonable suspicion ordinarily demanded to justify detaining an individual." *Rodriguez*, 575 U.S. at 355. The Fourth Amendment thus tolerates investigations unrelated to the purpose of the stop, as long as it is done "*within* the time reasonably required to complete the stop's mission." *Gorman*, 859 F.3d at 715 (citing *Rodriguez*, 575 U.S. at 355) (emphasis in original) (internal quotations omitted); *see also Muehler v. Mena*, 544 U.S. 93, 101 (2005) (no additional Fourth Amendment justification was required because the unrelated inquiries did not extend the length of the detention). The critical question is whether the check "prolongs—i.e. adds time to—the stop." *Rodriguez*, 575 U.S. at 357.

Nevertheless, if police have reasonable suspicion of an independent offense, the traffic stop may be extended to investigate those matters. *Landeros*, 913 F.3d at 867. "Reasonable suspicion exists when an officer is aware of specific, articulable facts which, when considered with objective and reasonable inferences, form a basis for *particularized* suspicion." *Id.* at 868 (internal quotations omitted) (emphasis in original). This determination is based on the totality of circumstances, with appropriate deference to the inferences drawn by the officer on

the scene. *United States v. Arvizu*, 534 U.S. 266, 273 (2002); *United States v. Valdes-Vega*, 738 F.3d 1074, 1077–79 (9th Cir. 2013) (en banc).

Reasonable suspicion "is not a particularly high threshold to reach and is less than probable cause or a preponderance of evidence." *United States v. Taylor*, 60 F.4th 1233, 1241 (9th Cir. 2023) (internal citations and quotations omitted). Despite the low threshold, reasonable suspicion cannot be based on "prefabricated or recycled profile[s] of specific behavior very likely to sweep many citizens into a generality of suspicious appearance merely by a hunch." *United States v. Rodriguez*, 976 F.2d 592, 595-96 (9th Cir. 1992). However, officers may make "commonsense judgments and inferences about human behavior," and "draw on their own experience and specialized training to arrive at conclusions that might well elude an untrained person." *Taylor*, 60 F.4th at 1241 (internal quotations and citations omitted).

Here, the traffic stop's mission concluded after 17 minutes when Sergeant Kilpela issued Ms. Conchas the warning. Applying these rules, the Court concludes that: (1) all of the actions taken by Sergeant Kilpela up until that point were within the stop's legitimate mission and did not prolong it; and (2) by the time the stop's mission concluded, Sergeant Kilpela had formed a reasonable suspicion of an independent offense to extend their interaction and her seizure

sufficient to justify prolonging the stop long enough to request for consent to search her vehicle.

### 1.    *Mission of the Stop*

To support her argument that the mission of the stop was unlawfully prolonged, Ms. Conchas argues that Sergeant Kilpela's EPIC check lacked reasonable suspicion and "exacerbate[ed] the unconstitutional nature of the encounter." (Doc. 29 at 18).  Supporting her assertion that an EPIC check is "an unrelated inquiry that requires reasonable suspicion," Ms. Conchas cites to *United States v. Funk*, CR 22-121-BLG-SPW, 2023 WL 4268900 (D. Mont. June 29, 2023) and *Gorman*, 859 F.3d at 711.  (Doc. 29 at 18).  However, her analysis is incomplete.

Consistent with *Landeros* and the prevailing case law, *Gorman* clarifies that independent reasonable suspicion is required only if the officer's unrelated inquiries actually prolong or add time to the stop.  859 F.3d at 715.  In *Gorman*, the officer conducted a routine records and criminal history check as part of a traffic stop.  *Id.* at 711.  Upon learning that Gorman had no prior arrests and no outstanding warrants, he requested an EPIC check.  *Id.*  The Ninth Circuit determined that because nothing in the officer's initial questioning of Gorman provided independent reasonable suspicion, and because the EPIC check added

time to the stop beyond what was necessary to for the stop's mission, the additional search violated the Fourth Amendment. *Id.* at 715.

Likewise, in *Funk*, the Court found that the mission of the traffic stop concluded after the officer received the results of the criminal history check and validated his information. 2023 WL 4268900, at *5. Thus, when the officer conducted an EPIC check after the initial criminal history check, without independent reasonable suspicion, it unlawfully prolonged the stop. *Id.* at *6.

Here, Sergeant Kilpela's request for an EPIC check did not prolong or add time to the stop. At the time Sergeant Kilpela requested dispatch to conduct an EPIC check and routine criminal history check, he was actively searching for the rental contract. It is unquestionably within the mission of a traffic stop for an officer to check a vehicle's registration and proof of insurance. *See Rodriguez*, 575 U.S. at 355. Likewise, a criminal history check "stems from the mission of the stop itself" and does not need to be supported by independent reasonable suspicion. *Taylor*, 60 F.4th at 1241 (citing *United States v. Hylton*, 30 F.4th 842, 848 (9th Cir. 2022)). The request for the EPIC check did not add time to the stop because during the pendency of the request, Sergeant Kilpela was attempting to verify the Defendant's entitlement to drive the vehicle through verification of the existence of a rental agreement. Unfortunately for Ms. Conchas, the time necessary for the "ordinary inquiries" during the mission of a traffic stop contemplated in *Rodriguez*

took longer than usual because Ms. Conchas misplaced the rental car contract and

Sergeant Kilpela could not locate information on the rental car through electronic

searching.  During that time, Sergeant Kilpela was able to learn where

Ms. Conchas was going, where she came from, and form independent reasonable

suspicion based on his observations and her answers.  Therefore, in accordance

with *Rodriguez*, the EPIC check does not need to be supported by reasonable

suspicion.

   2. *Request for Consent*

   Ms. Conchas next argues that Sergeant Kilpela's request for consent to

search her vehicle and the subsequent search unlawfully prolonged the traffic stop.

The mission of the stop was completed when Sergeant Kilpela issued the traffic

warning.  Thus, pursuant to *Rodriguez*, any action thereafter that prolongs the

traffic stop must be supported by reasonable suspicion to avoid violating the

Fourth Amendment.  By the time Sergeant Kilpela issued the traffic warning, he

had formed sufficient independent reasonable suspicion of drug trafficking to

prolong the stop to ask Ms. Conchas for consent to search her vehicle and receive

consent.

   Through the exhibits admitted at the evidentiary hearing and Sergeant

Kilpela's testimony, the government points to several factors that it posits led

Sergeant Kilpela to develop reasonable suspicion.  First, Ms. Conchas was driving

a rental vehicle, and they are commonly used to transport illegal drugs. Sergeant Kilpela testified that rental vehicles are popular for drug smuggling because they are difficult to track and surveil, given they are not attached to a certain individual. (Hearing Transcript, 30:19–31:5). Additionally, individuals engaged in drug trafficking do not run the risk of their vehicles being seized or forfeited because the rental vehicles do not belong to them. (*Id.* at 59:8–59:10).

Second, Ms. Conchas provided conflicting and suspicious information about her trip. Initially, Ms. Conchas told Sergeant Kilpela that she was driving from Los Angeles to Rockford. When Sergeant Kilpela asked why she would be coming through Montana, she said that she was actually coming from Sacramento where she attended a funeral. Ms. Conchas then asked if Sacramento and Los Angeles were the same place. Sergeant Kilpela testified that Los Angeles and Sacramento are at least five hours apart. (*Id.* at 22:11). Sergeant Kilpela flagged the response as suspicious, noting it was unlikely that Ms. Conchas—having purportedly completed the drive just two days prior—would be unaware of the significant distance between the two cities. He noted in his report and testified at the hearing that this was the point where he became suspicious that she was either lost or lying. (Doc. 35-1 at 15; Hearing Transcript, 22:20–22:22). Additionally, the Defendant's inability to explain why she was off-route, apart from blaming her GPS, contributed to further suspicion. Sergeant Kilpela testified that if

Ms. Conchas was traveling to Illinois, she was at least five or six hours off-route

and continuing even further off-route if she were to stay on Interstate 94. (Hearing

Transcript, 22:12–22:16). Sergeant Kilpela testified that based on his experience

in interdicting drugs, she may have been off-route because she was asked to make

a drop, or she was attempting to avoid law enforcement by driving through less

populated areas with a smaller law enforcement presence. (*Id.* at 58:5–60:3).

Third, Ms. Conchas was not wearing funeral attire and had no luggage with

her, despite claiming to have flown from Chicago to Los Angeles, rented a car to

drive from Los Angeles to Sacramento, and attended a funeral in Sacramento

before driving to Rockford, via Billings, which would have required more than

2,200 miles in the vehicle. When Sergeant Kilpela asked if she had anything in the

trunk, she said she did not and had not even been in the trunk. This was

additionally suspicious to Sergeant Kilpela because her lack of luggage indicated

that Ms. Conchas was trying to drive a long distance with minimal stops, a habit

common among drug couriers. (Doc. 36 at 14; *see also* Doc. 35-1 at 15).

Fourth, Ms. Conchas did not have a plausible reason for driving back to

Illinois, rather than flying, and appeared to Sergeant Kilpela to be deceptive in her

explanation. Sergeant Kilpela testified that in his experience, when individuals are

being deceptive, they will create a "think space." (Hearing Transcript, 28:16). He

explained that individuals will ask him to repeat a question or restate the question

back to him in an attempt to create more time to come up with a response. (*Id.*).

Sergeant Kilpela found it suspicious when Ms. Conchas said, "Huh?," repeated his

question back to him, and then did not come up with a logical answer. (*Id.* at

28:13–29:10). Additionally, Sergeant Kilpela pointed out that although Ms.

Conchas said it was cheaper to drive back, by the time the cost of gas is factored

into the numbers she provided, driving a rental car home was not cheaper.

(Hearing Transcript, 57:18–57:21).

Lastly, from his electronic searches of Enterprise records, Sergeant Kilpela

found several car rental contracts under Defendant's name from earlier in the year.

When Sergeant Kilpela asked her about a car she rented in Beloit, Wisconsin, and

returned to Logan International Airport in Boston—a trip of 1,106 miles within a

twenty-four hour period—Ms. Conchas claimed that she could not remember

where she went with the car. Sergeant Kilpela thought it was suspicious to put a

significant number of miles on a rental car in twenty-four hours but be incapable of

remembering where she went. (*Id.* at 31:12–31:18; *see also* Doc. 35-1 at 9). To

Sergeant Kilpela, this further supported his suspicion that she was transporting

drugs as it is common to rent vehicles in different cities across the country for short

periods of time and return them with high numbers of miles driven. (Hearing

Transcript, at 31:6–31:11).

Any one of these factors, standing alone, would be insufficient to support reasonable suspicion. In isolation, no single fact is dispositive of wrongdoing. However, when they are considered together, as required by the totality of the circumstances test, reasonable suspicion is met. Specifically, it was reasonable that Sergeant Kilpela suspected Ms. Conchas was trafficking narcotics. Thus, although the mission of the traffic stop had concluded when Sergeant Kilpela requested her consent to search the vehicle, it did not violate the Fourth Amendment to extend the seizure.

### B.    Consent to the Search

"It is well settled under the Fourth and Fourteenth Amendments that a search conducted without a warrant issued upon probable cause is 'per se unreasonable. . . subject only to a few specifically established and well-delineated exceptions.'" *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973) (internal citations omitted). A search conducted pursuant to consent is one of the specifically established exceptions to the warrant and probable cause requirement. *Id.* However, consent must be voluntary, unequivocal, and specific. *Taylor*, 60 F.4th at 1242-43 (internal citations and quotations omitted).

### 1.    Voluntariness

Whether consent was given voluntarily is analyzed based on the totality of the circumstances. *Schneckloth*, 412 U.S. at 226. Additionally, it is the

government's burden to prove that consent was freely and voluntarily given. *United States v. Rodriguez*, 464 F.3d 1072, 1077 (9th Cir. 2006). The Court will focus on five non-exclusive factors: "(1) whether the defendant was in custody; (2) whether the arresting officers had their guns drawn; (3) whether *Miranda* warnings were given; (4) whether the defendant was notified that they had a right not to consent; and (5) whether the defendant had been told a search warrant could be obtained." *Taylor*, 60 F.4th at 1243 (internal citations omitted).

No single factor is determinative of voluntariness. *Schneckloth*, 412 U.S. at 232-33. Rather, "if under all the circumstances, it has appeared that the consent was not given voluntarily—that it was coerced by threats or force, or granted only in submission to a claim of lawful authority," then the consent is invalid, and the search is unreasonable. *Id.* at 233. It weighs in favor of a finding of that a defendant's will was not overborne, and that the consent was voluntary, if the interaction is "calm" and "friendly." *Taylor*, 60 F.4th at 1243.

### a.     In Custody

Ms. Conchas asserts that she was "in custody for the purpose of evaluating whether she provided lawful consent." (Doc. 29 at 22). However, Ms. Conchas conflates "custody" for purposes of *Miranda*, and "seizure" under the Fourth Amendment. A person is "seized" within the meaning of the Fourth Amendment if a reasonable person in their circumstances would not have felt free to terminate the

encounter and leave. *United States v. Washington*, 490 F.3d 765, 775 (9th Cir. 2007). And while the Supreme Court has defined "custody" for purposes of triggering *Miranda* protections in a similar manner, it has clarified that "a person detained as a result of a traffic stop is not in *Miranda* custody." *Howes v. Fields*, 565 U.S. 499, 510 (2012) (internal citations omitted); *see also Maryland v. Shatzer,* 559 U.S. 98, 113 (the "temporary and relatively nonthreatening detention involved in a traffic stop or *Terry* stop does not constitute *Miranda* custody.").

While Ms. Conchas was seized at the time Sergeant Kilpela requested consent to search her vehicle, she was not in custody. Ms. Conchas was sitting in Sergeant Kilpela's patrol car, in the front seat, and not handcuffed or restrained. The fact that Ms. Conchas was not in custody at the time Sergeant Kilpela requested consent weighs in favor of the conclusion that her consent was given voluntarily.

### b.    *Guns Drawn*

Sergeant Kilpela never drew his gun or otherwise displayed it in a threatening manner. (Doc. 30). This too weighs in favor of the conclusion that her consent was given voluntarily.

### c.    Miranda *Warning*

Because Ms. Conchas was not in custody for purposes of *Miranda*, Sergeant Kilpela was not required to provide *Miranda* warnings. *See United States v. Ritter,*

752 F.2d 435, 438 (9th Cir. 1985) ("It would ... make little sense to require that *Miranda* warnings, which advise one of the right to remain silent and the right to counsel, be given by police before requesting consent."). This factor neither weighs in favor of a finding of voluntariness nor against it.

### d.    Notified of the Right to Refuse Consent

"Knowledge of the right to refuse consent is highly relevant in determining whether consent is valid." *United States v. Soriano*, 361 F.3d 494, 504 (9th Cir. 2004) (internal citations omitted). However, in *Schneckloth*, the Supreme Court refused to require the government to prove the defendant had knowledge of their right to refuse consent as a prerequisite showing of voluntariness. 412 U.S. at 232-33 ("[N]either this Court's prior cases, nor the traditional definition of 'voluntariness' requires proof of knowledge of a right to refuse as the sine qua non of an effective consent to search."). Rather, the Court held that it must analyze all the circumstances, in a "careful sifting of the unique facts and circumstances of each case." *Id.* at 233; *see also Taylor*, 60 F.4th at 1243 (finding Taylor's consent to be given voluntarily despite no direct proof that Taylor knew he had the right to refuse to consent).

Here, Ms. Conchas was notified of her right to refuse to consent. While she was not verbally told she had the right to refuse, she read and signed a waiver that gave her actual notice. The waiver stated, "I am giving this written permission to

these officers . . . after having been informed by said officer that I have a right to refuse this search and or seizure, and to stop such search at any time." (Doc. 35-1 at 7). Likewise, Sergeant Kilpela told Ms. Conchas to honk the patrol car's horn if she wanted him to stop searching her vehicle, a clear indication of her right to withdraw consent that she had just granted. This too weighs in favor of the conclusion that her consent was given voluntarily.

> e.    *Told That a Search Warrant Could be Obtained*

Any threat that a search warrant could be obtained if an individual does not consent to a search weighs against a finding of voluntariness. *See Taylor*, 60 F.4th at 1243. Here, Sergeant Kilpela did not make any suggestion that he could obtain a search warrant in the absence of Defendant's consent. This fact weighs in favor of the conclusion that her consent was given voluntarily.

In sum, at the time Ms. Conchas gave Sergeant Kilpela consent to search her vehicle, she was not in custody and therefore did not need *Miranda* warnings, Sergeant Kilpela's gun was not drawn, she was notified of her right to refuse and withdraw consent, and she was not told that a search warrant could be obtained regardless of her consent. All of these factors, analyzed together, clearly indicate that her will was not overborne and her consent was given voluntarily.

### 2.    Unequivocal and Specific

"A suspect may unequivocally and specifically consent by giving express permission, or consent can be inferred from conduct, such as a head nod." *Taylor*, 60 F.4th at 1243 (internal citations and quotations omitted). "Ultimately, the test 'is that of objective reasonableness—what would the typical reasonable person have understood by the exchange between the officer and the suspect?'" *Id.* at 1243–44 (quoting *Florida v. Jimeno*, 500 U.S. 248, 251 (1991)).

In *Taylor*, the defendant's consent to search was held unequivocal and specific when Taylor responded to the officer's request for consent with, "it don't matter to me." 60 F.4th at 1244. The Ninth Circuit determined that "in context, a reasonable person would have understood Taylor to be consenting to a search of the car." *Id.*

Here, Ms. Conchas gave express consent to Sergeant Kilpela to search her car. Her consent was even more unequivocal and specific than in *Taylor*. Ms. Conchas verbally indicated that she did not have an issue with him searching the car, read the written waiver which clearly indicated that she was consenting to a search and seizure of any contraband discovered, and signed the consent form. A reasonable person would understand these facts to indicate that Ms. Conchas was consenting to a search of her car.

Accordingly, Defendant's consent was given voluntarily, unequivocally, and specifically.  Sergeant Kilpela's search of Defendant's vehicle was valid under the consent exception to the warrant requirement.

## IV.    Conclusion

**IT IS HEREBY ORDERED** that Defendant's Motion to Suppress (Doc. 29) is **DENIED.**

The Clerk of Court is directed to notify the parties of the making of this Order.

DATED this 27th day of January, 2026.

WILLIAM W. MERCER
UNITED STATES DISTRICT JUDGE